**COLE SCHOTZ P.C.**
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
(212) 752-8000
(212) 752-8393 Facsimile
Leo V. Leyva
James T. Kim
Michael R. Yellin
*Attorneys for W Financial Fund LP*

**Hearing Date and Time:**
**January 26, 2017, at 10:30 a.m.**
**Objection Deadline:**
**January 19, 2017, at 10:30 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SHIROKIA DEVELOPMENT, LLC, | Case No. 16-45568 (NLH) |
| Debtor.[1] | |

**DECLARATION OF DAVID HEIDEN IN SUPPORT OF W FINANCIAL FUND LP'S MOTION FOR ENTRY OF AN ORDER: (A) APPOINTING A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a); (B) DIRECTING MORTGAGE DEBTOR TO DEPOSIT ALL RENTS GENERATED FROM THE PROPERTY, WHICH RENTS CONSTITUTE W FINANCIAL FUND LP'S CASH COLLATERAL, INTO A SEGREGATED ACCOUNT; AND (C) DIRECTING MORTGAGE DEBTOR TO PROVIDE AN ACCOUNTING OF RENTS GENERATED TO DATE**

Of Counsel and on the Brief:
    Leo V. Leyva
    James T. Kim
    Michael R. Yellin

---

[1] The last four digits of Debtor's federal tax identification numbers are 8971.

David Heiden, of full age, hereby makes the following declaration in lieu of affidavit pursuant to 28 U.S.C. § 1746.

1. I am the Managing Member of W Financial Fund LP ("**W Financial**"). As such, I am fully familiar with the facts set forth herein and am duly authorized to make this Affidavit on W Financial's behalf. I submit this Affidavit in support of W Financial's motion (the "**Motion**") for entry of an order: (A) appointing a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a); (B) directing Shirokia Development, LLC ("**Mortgage Debtor**") to deposit all rents generated from that certain real property located at 142-28 38th Avenue, Flushing, New York (the "**Property**"), which rents constitute W Financial's cash collateral, into a segregated account; and (C) directing Mortgage Debtor to provide an accounting of rents generated to date.

## BACKGROUND

### Overview.

2. Hong Qin Jiang ("**Jiang**") is the sole member of Shirokia Mezz I LLC ("**Mezzanine Debtor**"),[2] which in turn is the sole member of Mortgage Debtor, a single asset real estate entity that owns the Property. This is the *third bankruptcy* by Jiang's subordinate entities (the "**Jiang Entities**") that arises from the *third consecutive default* by the Jiang Entities on debt obligations secured directly or indirectly by the Property.

---

[2] Mezzanine Debtor is a debtor in a separate chapter 11 proceeding pending before this court and identified by Case No. 16-43666 (NHL). No motion to consolidate or jointly administer the cases has been filed in either case.

**First Default - The Cathay Loan.**[3]

3. On or about May 18, 2005, Mortgage Debtor acquired the Property, which at the time was vacant land, for $3,780,000.00. In connection with that purchase, Cathay Bank ("**Cathay**") lent Mortgage Debtor the sum of $11,700,000.00, as evidenced by two mortgage notes totaling $11,700,000.00. The mortgage notes were secured by two mortgages recorded against the Property. Using the loan proceeds, Mortgage Debtor developed the Property to contain: (a) four (4) commercial condominium units; (b) twenty three (23) residential condominium units; and (c) forty seven (47) parking spaces.

4. None of the condominium units was ever sold and Mortgage Debtor defaulted on its payment obligations to Cathay. As a result, Cathay commenced a foreclosure proceeding against Mortgage Debtor in the Supreme Court of the State of New York, County of Queens, under Index Number 4019/2011.

5. On June 30, 2011, Cathay assigned the mortgage notes, the mortgages, and the foreclosure proceeding to 38th Avenue Realty LLC ("**38AR**"). 38AR prosecuted the foreclosure to conclusion and, on July 28, 2014, obtained a Judgment of Foreclosure and Sale. As of the date of the judgment, Mortgage Debtor owed 38AR the sum of $15,456,373.38, with interest continuing to accrue at eleven percent (11%) per annum.

6. Less than two weeks later, on August 12, 2014, Mortgage Debtor filed a chapter 11 petition in the Southern District of New York. The chapter 11 proceeding was subsequently transferred to the Eastern District of New York and assigned Case No. 14-44373 (NHL). This

---

[3] The facts set forth in this section are derived from the October 23, 2014 Declaration of John Ng, the managing member of Mortgage Debtor's prior lender, a true copy of which is attached hereto as **Exhibit A**.

3

Court confirmed Mortgage Debtor's First Amended Chapter 11 Plan of Liquidation (the "**Plan**") on March 18, 2015.[4]

### Second Default – The Madison Loan.

7. On April 1, 2015, one day before the Property was to be sold at auction pursuant to the Plan, Mortgage Debtor obtained a $14,000,000.00 loan from Madison Realty Capital ("**Madison**") and was able to refinance its obligations outside of bankruptcy.

8. As reflected in the payoff statement attached hereto as **Exhibit B**, by September 1, 2015, Mortgage Debtor had defaulted under the terms of its loan with Madison.

### Third Default - The Mortgage and Mezzanine Loan Documents.

9. To avoid foreclosure of the Property by Madison, on December 23, 2015, Mortgage Debtor refinanced the Madison debt through two loans, in the combined original principal amount of $20,000,000.00.

10. Specifically, Mortgage Debtor obtained a loan for $18,000,000.00 (the "**Mortgage Loan**") from W Financial. The Mortgage Loan was memorialized by a Consolidated, Amended and Restated Mortgage Note (the "**Mortgage Note**") payable to W Financial, and secured by, among other things, a Consolidated, Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing (the "**Mortgage**," and, together with the Mortgage Note and the related loan documents, collectively, the "**Mortgage Loan Documents**") in favor of W Financial. The Mortgage Loan Documents granted W Financial a first mortgage lien on, among other things, the Property.

11. In addition, Mezzanine Debtor obtained $2,000,000.00 in mezzanine financing (the "**Mezzanine Loan**") from 38th Avenue Mezz LLC (the "**Mezzanine Lender**"). The

---

[4] The Court closed Mortgage Debtor's first bankruptcy case on January 27, 2016.

4

Mezzanine Loan is secured by, among other things, Mezzanine Debtor's pledge of a first priority security interest in all of its right, title, and interest in and to Mortgage Debtor (the "**Pledged Membership Interests**"). That pledge is memorialized in a December 9, 2015 Pledge and Security Agreement (the "**Pledge Agreement**"), a December 23, 2015 Mezzanine Loan Agreement (the "**Mezzanine Loan Agreement**"), and related loan documents (collectively, the "**Mezzanine Loan Documents**"). Notably, the Mezzanine Loan is subordinate and junior to the Mortgage Loan in all respects; as such, the Mortgage Loan must be paid in full and satisfied before Mezzanine Lender is permitted to accept a payoff of the Mezzanine Loan.[5]

### The Mortgage Note.

12. As set forth above, the Mortgage Loan is evidenced by the Mortgage Note. (A true copy of the Mortgage Note is attached hereto as **Exhibit C**.)

13. The Mortgage Note provides, among other things, that:

> [Mortgage Debtor] hereby promise(s) to pay to the order of [W Financial], . . . the principal sum of **EIGHTEEN MILLION and 00/100 DOLLARS ($18,000,000.00)** together with interest on the principal amount hereof from time to time outstanding from the date hereof at the Interest Rate (as hereinafter defined) . . . .

Exh. C, pp. 1-2.

14. Furthermore, the Mortgage Note confirms that:

> Upon the failure of [Mortgage Debtor] to make any payment due hereunder, beyond all applicable grace and/or cure period, or upon the occurrence and during the continuance of any Event of Default (as defined in the Mortgage), the principal sum hereof, or so much thereof as may be outstanding, together with accrued interest and all other expenses payable by [Mortgage Debtor] under the Loan Documents, including but not limited to, reasonable attorneys' fees and disbursements for legal services incurred by [W Financial] in

---

[5] Mezzanine Debtor's improper attempt to repay the Mezzanine Loan without first repaying the Mortgage Loan is the subject of Mezzanine Lender's motion to dismiss filed in Mezzanine Debtor's chapter 11 proceeding [Docket No. 17]. Those arguments are incorporated herein by reference.

5

>collecting or enforcing payment of all sums due under the Loan Documents whether or not suit is brought, and if suit is brought, then through all appellate actions, shall immediately become due and payable at the option of [W Financial], notwithstanding the Maturity Date set forth above . . . .

Id., p. 4.

15. Pursuant to the Mortgage Note, "Event of Default" has the same meaning ascribed to that term in the Mortgage  See ¶ 25, infra.

16. The Mortgage Note matures on December 23, 2016.  Id., p. 2.

### The Mortgage.

17. To secure Mortgage Debtor's indebtedness, on December 23, 2015 Mortgage Debtor executed and delivered the Mortgage to W Financial.  (A true copy of the Mortgage is attached hereto as **Exhibit D**.)

18. Pursuant to the Mortgage, W Financial holds a first mortgage lien against the Property, which is described as that certain property known as the Shirokia Tower Condominium, 142-28 38th Avenue, Commercial Unit Com1A, Community Facility Units CF-2A, CF-2B and CF-2C, Residential Units 3-A, 3-B, 5-A, 5-B, 6-A, 6-B, 6-C, 7-A, 7-B, 7-C, 8-A, 8-B, 8-C, 9-A, 9-B, 9-C, 10-A, 10-B, 10-C, PH-A, 11-B, 11-C, and Parking Units P-1 through P-47, Flushing, New York 11354, and more particularly described in Exhibit A to the Mortgage. Exh. D, p. 1.

19. The Mortgage also contains an absolute Assignment of Leases and Rents pursuant to which Mortgage Debtor absolutely and unconditionally assigned and granted to W Financial, among other things, all existing and future leases affecting the use, enjoyment, or occupancy of the Property, as well as all rents derived from the Property (the "**Assignment of Leases and Rents**").  Id., § 2.09.

20. Specifically, the Assignment of Leases and Rents provides:

> [Mortgage Debtor] hereby absolutely, unconditionally and currently assigns to [W Financial] all its right, title and interest as landlord under Leases now existing or hereafter entered into, and all rents and other sums payable to [Mortgage Debtor] under each such Lease, together with the right to collect and receive the same, provided that, if and so long as no Event of Default (as defined in Section 5.01) shall have occurred and be continuing, [Mortgage Debtor] shall be permitted to exercise its rights and perform its obligations as landlord under the Leases and to collect and receive such rents and other sums payable to [Mortgage Debtor] for its own uses and purposes subject to the provisions of this Mortgage. Such assignment shall be fully operative without any further action on the part of either party and [W Financial] shall be entitled, at its option, upon the occurrence and during the continuance of an Event of Default hereunder, to all rents and other sums payable to [Mortgage Debtor] whether or not [W Financial] takes possession of the Mortgaged Property . . . .

Id., § 2.09.03.

21. The Mortgage further provides that Mortgage Debtor "will not, without the prior written consent of [W Financial], enter into any Lease not in effect on the date hereof." Id., § 2.09.02.

22. Moreover, upon the execution of the Mortgage, Mortgage Debtor provided W Financial with a Certificate of Borrower and Guarantor, a copy of which is attached hereto as **Exhibit E**. Pursuant to the Certificate of Borrower and Guarantor, Mortgage Debtor represented:

> No person, party, firm or corporation has (a) any possessory interest in the premises or right to occupy the same under and pursuant to the provision of existing leases between tenants of the Premises and [Mortgage Debtor], the terms of all such leases having previously been disclosed to [W Financial] in writing . . .

Exh. E, ¶ 16.

23. At the time the Certificate was signed, neither Mortgage Debtor nor Jiang, the guarantor, had ever identified any person, party, firm, or corporation with any existing lease or possessory interest in the Property.

24. In addition, the Mortgage provides:

> [Mortgage Debtor] acknowledges that in order to maximize the value of the Mortgaged Property to protect the value thereof, as security for the Loan, until all indebtedness secured by this Mortgage has been paid in full, [Mortgage Debtor] **shall not lease or occupy all or any portion of the Mortgaged Property** for use as a personal residence or otherwise.

Id., § 2.10 (emphasis added).

25. Pursuant to the Mortgage, each of the following events shall constitute an event of default ("**Event of Default**"):

> (a) [Mortgage Debtor] shall default in the due and punctual payment of (i) any periodic installment of interest or principal, and such default shall continue for five (5) or more days, or (ii) the outstanding principal balance of the Note, together with interest accrued thereon and all other sums which may then be owed by [Mortgage Debtor] to [W Financial], at maturity or upon declaration of acceleration or required in connection with a prepayment of the Indebtedness in full; or
>
> (b) [Mortgage Debtor] shall default in the payment, when and as due and payable, of any other indebtedness or other sums payable pursuant to the Note, this Mortgage, and such default shall continue for ten (10) or more days following written notice to [Mortgage Debtor]; or
>
> . . .
>
> (e) any warranty, representation or other settlement made by or on behalf of [Mortgage Debtor] in or pursuant to this Mortgage or in connection with the application of the Loan (including, without limitation, any financial statement delivered pursuant to Section 4.06) is knowingly false, incorrect or misleading in any material respect and is not cured within 30 days' notice; or
>
> (f) [Mortgage Debtor] or the Guarantor shall make an assignment for the benefit of creditors, or shall be generally not paying its debts as they become due, or shall commence a case under the federal bankruptcy laws, or shall file any petition or answer or take any action seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, or shall file an answer admitting or not contesting the material allegations of a petition against it in any such proceeding, or shall seek or consent

> to or acquiesce in the appointment of any trustee, custodian, receiver or liquidator of [Mortgage Debtor] or any Guarantor, or any material part of its properties or assets, or if [Mortgage Debtor] or the Guarantor shall take any action for the purpose of the foregoing; or
>
> . . .
>
> (t) [Mortgage Debtor] fails to comply with the covenants as to the Mezzanine Loan.

Id., § 5.01.

26. Pursuant to the Mortgage, upon the occurrence of an Event of Default, among other things:

> [I]nterest at the Default Rate shall be due and payable on the principal of and (to the extent permitted by law) interest, any fees and other charges thereon as due under the Note at the time outstanding together with all other indebtedness secured hereby, from the date of the Event of Default until actual receipt by [W Financial] of payment in full of the indebtedness and (ii) [W Financial] may, at any time after any Event of Default, declare, by written notice to [Mortgage Debtor], the Note, and all other indebtedness secured hereby to be due and payable upon the date specified in such notice and upon such date the same shall become due and payable, together with interest accrued thereon, without presentment, demand, protest or notice, all of which [Mortgage Debtor] hereby waives.

Id., § 5.01(z).

### **Mortgage Debtor Defaults Under the Mortgage Loan Documents.**

27. Mortgage Debtor defaulted under the terms of the Mortgage Loan Documents by failing to make its February 1, 2016 interest payment, which was its first scheduled interest payment after the Mortgage Loan closed.

28. Thus, by Notice of Event of Default dated February 8, 2016, a true copy of which is attached as **Exhibit F**, W Financial notified Mortgage Debtor of the occurrence of this Event of Default and advised:

> That interest on the Loan accrues at the Default Rate of twenty four (24%) percent from February 5, 2016 until such time as the Loan default has been cured. In addition, [Mortgage Debtor] is now obligated to pay [W Financial] the Exit Fees as set forth in the Note, due to [Mortgage Debtor]'s failure to timely make the Note payments. Please be further advised that at this time [W Financial] does not declare all sums due and owing under the Loan Documents immediately due and payable, but reserves the right to do so at any time during the existence of an uncured Event of Default.

Exh. F.

29. Because Mortgage Debtor failed to cure the aforementioned defaults, on February 17, 2016, W Financial sent Mortgage Debtor an acceleration notice (the "**February 17 Notice**"), whereby it exercised its right to accelerate the entire Mortgage Loan. (A true copy of the February 17 Notice is attached as **Exhibit G**.) Specifically, the February 17 Notice advised:

> [Mortgage Debtor] failed to cure the Events of Default referenced in the 2/8 Default Letter and therefore, to the extent it has not already done so, [W Financial] hereby exercises all available rights and remedies available under the Loan Documents. Be advised that (i) pursuant to the Note, [W Financial] hereby accelerates the Indebtedness and declares the Indebtedness immediately due and payable, (ii) pursuant to Section 5 of the Interest Reserve Agreement, Lender hereby elects to apply the balance of the Reserve thereunder in the amount of $941,111.39 to reduce the Indebtedness, and (iii) pursuant to Section 5 of the Common Charges Reserve Agreement, [W Financial] hereby elects to apply the balance of the Reserve thereunder in the amount of $250,023.23 to reduce the Indebtedness.

Exh. G.

### The Foreclosure Action.

30. Mortgage Debtor did not cure its defaults in response to the February 17 Notice. Thus, on March 17, 2016, W Financial commenced foreclosure proceedings (the "**Foreclosure Action**") against Mortgage Debtor in the Supreme Court of the State of New York, County of

Queens, under Index No. 703179/2016.  (A true copy of W Financial's Verified Complaint with exhibits, is attached hereto as **Exhibit H**.)

31. In addition, consistent with its rights under the Mortgage Loan Documents as well as New York's Real Property Actions and Proceedings Law, W Financial applied for the appointment of a receiver to oversee the management of the Property and collect any rents or profits generated from the Property.

32. Indeed, even though Mortgage Debtor had expressly represented that there were no tenants at the Property and acknowledged and agreed that no leases would be signed absent W Financial's consent, at the time that it filed the Foreclosure Action, W Financial believed that the Property was being improperly rented due to, among other things, photographs taken of the Property that reflected the Property being utilized at night, as well as a sign posted on the Property with a telephone number to call, presumably in order to rent condominium units.  (True copies of the referenced photographs are attached at **Exhibit I**.)  **Critically, as described below, W Financial's suspicions of improper leasing at the Property were confirmed, under oath, by Mortgage Debtor in the Foreclosure Action.**

33. On April 11, 2016, the state court entered an Order Appointing a Receiver (the "**Receiver**") for the Property (the "**Order Appointing a Receiver**").  (A true copy of the Order Appointing a Receiver is attached as **Exhibit J**.)

34. On May 24, 2016, W Financial moved for summary judgment of foreclosure.  (A true copy of the May 24, 2016 Notice of Motion is attached as **Exhibit K**.)

35. While the summary judgment motion was pending, but before the Receiver took control of the Property, it was discovered that the Order Appointing a Receiver for the Property contained a typographical error.

36. Thus, even though the Order Appointing a Receiver had already been entered, the Receiver had already posted a bond, and the Receiver had already filed his oath with the state court, the Receiver did not commence his control over the Property.

37. To address the issue and expedite the Receiver's placement in control and operation of the Property, on July 20, 2016, W Financial filed, and on July 28, 2016, the state court signed, an Order directing Mortgage Debtor to show cause why the typographical errors in the Order Appointing a Receiver (which also appeared in the Notice of Pendency and Verified Complaint), should not be deemed corrected, *nunc pro tunc*. (A true copy of the state court's July 28, 2016 Order to Show Cause is attached as **Exhibit L**.)

38. On December 1, 2016, over Mortgage Debtor's objection, the state court granted W Financial's application to correct, *inter alia*, the typographical error in its Order Appointing a Receiver. (A true copy of the state court's December 1, 2016 Memorandum (the "**Memorandum**") is attached as **Exhibit M**.)

39. The Memorandum directed W Financial to submit a form of order (the "**Amended Order**"), which W Financial submitted in short order. (A true copy of the W Financial's proposed Amended Order, submitted on December 5, 2016, is attached as **Exhibit N**.)

40. On December 9, 2016, before the state court had the opportunity to enter the proposed Amended Order, Mortgage Debtor filed its chapter 11 petition.

**Jiang's Efforts to Forestall W Financial's Exercise of its Contractual Rights and Remedies.**

41. Jiang has no intention of or ability to pursue a legitimate reorganization for either Mortgage Debtor or Mezzanine Debtor.

42. When faced with the foreclosure of the Mortgage Loan as well as the scheduling of a UCC Sale of the Pledged Membership Interests in connection with the Mezzanine Loan, Jiang waited until the eve of the UCC sale to file a chapter 11 petition for Mezzanine Debtor.

43. Mortgage Debtor did not immediately file for bankruptcy.

44. Instead, Jiang has allowed Mezzanine Debtor's bankruptcy to languish since August 16, 2016 without bringing Mortgage Debtor under the auspices of the bankruptcy court, despite the fact that both the Mezzanine Loan and Mortgage Loan will need to be satisfied through this process.

45. In fact, much like her dilatory strategy with Mezzanine Debtor, Jiang waited until the Receiver was on the verge of taking control of the Property before filing bankruptcy for Mortgage Debtor.

**Mortgage Debtor's Unauthorized Activities at the Property and Failure to Obtain Necessary Approvals to Sell Condominium Units at the Property.**

46. In opposing W Financial's summary judgment motion in the Foreclosure Action, Mortgage Debtor admitted, under oath, to leasing units at the Property, in direct contravention of the Mortgage Loan Documents and Mortgage Debtor's express representations to W Financial. (A true copy of Mortgage Debtor's June 9, 2016 Affidavit is attached hereto as **Exhibit O**.)

47. Specifically, Mortgage Debtor filed an affidavit admitting that "of the twenty-three (23) residential units at the Property, some of those residential units are currently occupied by tenants, some of whom pay rent to [Mortgage Debtor] pursuant to written and oral leases (depending on the unit), and all of whom are individuals who reside in certain of the residential units at the Property." Exh. O, ¶ 8.

48. Mortgage Debtor's affidavit further provides that "of the three (3) commercial units at the Property, all of those commercial units are currently occupied by tenants . . . [which

13

are] obligated to pay rent to [Mortgage Debtor] for the use or occupancy of the commercial space at the Property." Id., ¶ 9-10.

49. In further support of its opposition to summary judgment, Mortgage Debtor submitted an affidavit from one of its tenants to the state court. (A true copy of the June 9, 2016 Affidavit of Yu Ying Chen is attached hereto as **Exhibit P**.)

50. The Yu Ying Chen Affidavit confirms that Yu Ying Chen has "resided at Residential Unit 8C located at the Property since June 3, 2015." Exh. P, ¶ 2.

51. W Financial was never advised of, nor did it consent to, the tenancy of Yu Ying Chen or any other tenant at the Property.

52. W Financial has also never been provided with any of the rents generated from the tenants at the Property. In fact, W Financial has not received any monies from Mortgage Debtor since the closing of the Mortgage Loan.[6]

53. Mortgage Debtor has also not been forthcoming with the Court about its assets and income. Indeed, despite admitting under oath in the Foreclosure Action that the Property is generating rental income, Jiang states under oath in Mortgage Debtor's Statement of Financial Affairs ("**SOFA**"), filed on December 9, 2016, that Mortgage Debtor's gross revenue is "$0.00." (A true copy of Mortgage Debtor's Schedules and SOFA is attached hereto as **Exhibit Q**.) Similarly, Mezzanine Debtor's SOFA reflects that Mezzanine Debtor has no gross revenue from business. (A true copy of Mezzanine Debtor's SOFA is attached hereto as **Exhibit R**.)

54. Moreover, despite averring in the Foreclosure Action that the Property has commercial and residential tenants, Mortgage Debtors' schedules only identify three commercial leases and no residential leases. See Exh. Q, Schedule G.

---

[6] To the extent Mortgage Debtor is indeed receiving rents from unauthorized tenants, such monies constitute W Financial's cash collateral and W Financial does not consent to Mortgage Debtor's use of same.

14

55. Jiang's failure to include the revenue derived from the tenants in the Debtors' SOFAs and her failure to identify the leases she previously averred were in place is indicative of either: a deliberate attempt to hide this information from the Court and creditors or an inexcusable lack of knowledge about the management of the Property. In either event, it is clear that Mortgage Debtor is not suited to remain in control of the Property.

56. Mortgage Debtor's failure to provide accurate financial information is almost certainly intentional, given Mortgage Debtor's prior reliance on the existence of tenants at the Property in its efforts to avoid summary judgment in the Foreclosure Action.

57. Mortgage Debtor has also made no progress toward its stated intention of having the Property recognized as a condominium by the New York Attorney General's Office, which would allow sales of the units to take place. In fact, upon information and belief, the Attorney General's Office has indicated that it will not approve the condominium units to be sold as such.

58. Based on these facts, and for all the reasons set forth in the accompanying Memorandum of Law, W Financial respectfully requests that the Court grant its Motion so that it may proceed with the exercise and enforcement of its legitimate rights and remedies under the Mortgage Loan Documents.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ David Heiden*

DATED: December 23, 2016                                                                 David Heiden